IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Jessica Taylor,                              )
                                             )
                    Plaintiff,               )
                                             )        Civil Action No. 2:22-3387-BHH
v.                                           )
                                             )        <u>**Opinion and Order**</u>
Charleston Southern University,              )
                                             )
                    Defendant.               )
_____ )

This matter is before the Court upon Defendant Charleston Southern University's ("Defendant" or "CSU") motion for summary judgment (ECF No. 39) on all claims asserted by Plaintiff Jessica Taylor ("Plaintiff" or "Taylor"). The motion has been fully briefed and is ripe for disposition. (*See* ECF Nos. 39, 44, 48.) After review, the Court finds that a hearing is not necessary. For the reasons set forth herein, the Court grants Defendant's motion in full.

## <u>BACKGROUND</u>

In this action, which was removed to this Court on September 30, 2022, Plaintiff asserts claims against CSU for disability discrimination, including failure to accommodate, under the Americans with Disabilities Act, 42 U.S.C. § 12112, *et seq.* ("ADA") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* ("Section 504"); retaliation under the ADA and Section 504; and intentional infliction of emotional distress under South Carolina law. According to Plaintiff's complaint, while she was enrolled as a nursing student at Defendant CSU, she requested reasonable accommodations from CSU for her qualifying disabilities, but CSU unreasonably and illegally denied her requests, thereby causing her damages.

**The Nursing Program at CSU**

Defendant CSU is a private university located in Charleston, South Carolina, that receives federal funding and is therefore subject to certain requirements under the ADA and Section 504. *See* 42 U.S.C. § 12182(a); 29 U.S.C. § 794(a). CSU operates a College of Nursing with an undergraduate degree program ("the nursing program") that confers Bachelor of Science in Nursing degrees on qualified students. (ECF No. 39-2 at 313-16.) Courses within CSU's nursing program include lectures, labs, and clinical experiential learning consistent with South Carolina State Board of Nursing requirements. (ECF No. 39-3 at 25-26; ECF No. 44-14 at 70:9-17.) The nursing program requires the successful completion of six semesters of nursing program components plus two semesters of prerequisite courses. (ECF No. 44-14 at 98:11-17.)

CSU's nursing program has an attendance policy that allows nursing students to miss up to 25 percent of classroom lectures and still complete a course. (ECF No. 39-2 at 338; ECF No. 44-14 at 51:20–52:3.) Also, professors in the nursing program can record their lectures and make the lectures and lecture notes available to students for review. (ECF No. 44-21 at 39:13-16.) The clinical portion of nursing courses are subject to a different attendance policy, where nursing students are allowed to miss up to one clinical per course per semester without penalty so long as the student completes a makeup assignment. (ECF No. 39-2 at 339-41; ECF No. 44-14 at 48:11–50:3.) If a nursing student misses two clinicals per course in a single semester, then the student must retake the course. (ECF No. 44-14 at 49:10-24.)

In spring of 2020, as a result of the COVID pandemic, CSU altered its academic programs, including the nursing program, from in-person to virtual classes. (ECF No. 44-21

at 20:22–21:12.) Hospitals where CSU's nursing students would typically complete in-person clinical requirements were closed to nursing students during spring 2020. (ECF No. 44-14 at 156:3:22.) Due to the uncertainty caused by the pandemic, CSU, with approval from the State Board of Nursing, allowed nursing students to complete the remainder of their clinicals during the spring 2020 semester using virtual simulation options, including a program called NurseTim. (*Id*. at 131:23–132:13; ECF No. 39-3 at 35-36.). Dr. Andreea Meier, the former Dean of CSU's College of Nursing, testified that nursing classes and clinicals were taught online during the COVID pandemic, which did not change the nursing program's standard of performance nor its grading scale during that time. (ECF No. 44-14 at 161:8–162:8.)

By fall of 2020, CSU returned to its pre-pandemic requirement of in-person clinicals for nursing students. (*Id*. at 156:21–157:6.) Dr. Meier sent an email to all nursing students on August 7, 2020, stating that "[n]ursing students should be prepared for on-campus classes, labs, simulations, and in-hospital clinical practicums this fall 2020 semester." (ECF No. 39-3 at 37.)[1]

In addition, due to the COVID pandemic, CSU utilized online learning technology, including holding lectures online and distributing pre-recorded lectures and assignments online. (ECF No. 44-2 at 70:20–71:22.) In certain circumstances, CSU used virtual

---

[1] During the fall 2020 semester, CSU made an exception to its clinical attendance requirement for students who had COVID or had known exposure to COVID to prevent spread of the virus among students and patients in clinical settings. (ECF No. 44-14 at 125:6–126:4.). The quarantine period for individuals who had COVID or COVID symptoms was ten days, which would result in a nursing student having to miss two clinicals during any given week. (*Id*. at 125:18-22.) Therefore, during this time, a student who had contracted COVID was permitted to miss two clinicals per course so long as they made them up; however, if that student had to miss more than two clinicals, the student would have to medically withdraw from the nursing program for the semester. (*Id*. at 125:6–126:12.)

simulations in place of in-person or on-site clinicals for missed clinical makeup assignments and to assess students' critical reasoning skills.  (ECF No. 44-5 at 56:4–57:7; 62:19-24.)

CSU has an Office of Disability Services ("ODS"), which is responsible for ensuring that a qualifying student in need of accommodations receives reasonable accommodations. (ECF No. 39-12 at 2-6.)  CSU also maintains a Handbook for Students with Disabilities, which describes the student accommodation policies and procedures.  (*Id*. at 7-16; ECF No. 39-2 at 304.)  Students who need accommodations are advised to contact ODS to request accommodations and to provide medical documentation as necessary to allow ODS to evaluate the student's requested accommodations.  (ECF No. 39-12 at 7-17.) According to CSU's Handbook for Students with Disabilities, if a student does not receive the accommodations that he or she requests, then the student may meet with CSU's Director of Disability Services and/or the student's professors to more completely discuss and explore appropriate, reasonable accommodations.  (*Id*. at 15.) If the student still feels that an offered accommodation is not reasonable or effective, then the student can utilize the grievance procedures as outlined in CSU's Student Handbook or the University Catalog.  (*Id*.)

**Taylor's Experience at CSU**

Taylor enrolled at CSU in January 2018, and it appears that she currently remains a student at CSU and is on track to graduate in December 2024.  (ECF No. 44-18 at 23:17-19; 44:5-6.)  After completing four semesters at CSU, Taylor applied to and was accepted into the nursing program for the Spring 2020 semester.  (*Id*. at 24:12-17; 67:4-7.) Thus, Taylor's enrollment in the nursing program coincided with the onset of the COVID pandemic, when CSU implemented certain modifications to the program as outlined above.

4

Taylor completed three semesters in CSU's nursing program without requesting any formal accommodations from ODS. (ECF No. 44 at 11.) During those three semesters, Taylor did not miss more than one clinical in any of her nursing courses, and she was not penalized for missing any clinicals or lecture courses. (ECF No. 44-18 at 88:15-24; 152:1-10; 152:24– 153:20; 155:14-23; 280:19–281:2.)

Taylor has a qualifying disability under the ADA and Section 504 of the Rehabilitation Act. Specifically, Taylor has been diagnosed with two autoimmune conditions, including small fiber sensory and autonomic neuropathy associated with gAchr antibody and autoimmune autonomic ganglionopathy ("AAG"). (ECF No. 39-3 at 40-41.) Symptoms caused by these conditions include, but are not limited to, nerve pain, hypotension, urinary urgency and frequency, dry eyes and mouth, decreased ability to sweat, and fatigue. (*Id*.) As a result of gastrointestinal dysmotility, Taylor needed to have a feeding tube inserted in her stomach to prevent malnutrition. (*Id.*) Taylor was diagnosed with autonomic neuropathy associated with gAchr antibody in 2017, prior to her enrollment at CSU, and she was diagnosed with AAG in 2021. (ECF No. 44-18 at 82:7-23.) Since 2020, Taylor has received IV infusion treatments to control her symptoms. (*Id.* at 187:3-16; ECF No. 39-3 at 40-41.)

Although Taylor completed the nursing program requirements in spring 2020, fall 2021, and spring 2021 without requesting accommodations from ODS, her professors did accommodate her on a case-by-case basis when asked. (ECF No. 44-18 at 29:3–30:17; 73:9-19.) For example, in January 2021, Taylor contacted Dr. Meier about the shoes she could wear to clinicals, and Dr. Meier advised Taylor that she should reach out to Dr. Watson if she needed accommodations. (ECF No. 44-18 at 80:10–81:12.; ECF No. 39-3

at 43-46).  Specifically, Dr. Meier told Taylor:

> Any accommodations have to be requested through the Student Success
> Center with Dr. Annie Watson.  Please work with her to obtain the necessary
> paperwork to submit to your instructors for this.  As long as the shoes are
> non-porous and closed toe, and not fabric/canvas type shoes, then there
> shouldn't be an issue.

(*Id*).  After further discussion with Dr. Meier, Taylor was able to identify shoes she could

wear that met her personal needs and those of the nursing program.  (*Id.*)

Taylor also emailed instructor Dr. Kerri Nelson on March 29, 2021, about a Cath Lab

on-site at a hospital facility.  Taylor asked Dr. Nelson if there would be an issue with her

bringing a backpack for her medications and feeding tube.  (ECF No. 39-4 at 32-33).  Dr.

Nelson responded: "I can't guarantee a spot for your items in the cath lab, you're welcome

to keep it up on the unit with us.  If you need it with you on the floor, I can talk to the

manager for a spot. I hope that helps."  (*Id.*)  Taylor responded, "I do, preferably, need to

keep my things with me just in case I need to urgently take medication or something of that

nature."  (*Id.*)  Dr. Nelson responded, "That's not a problem."  (*Id.*)

On April 5, 2021, Taylor emailed instructor Dr. Julia Ferguson to inform Dr. Ferguson

that she would not be able to attend a Zoom meeting prior to a virtual clinical on the

following day because she had an appointment scheduled.  (ECF No. 39-4 at 30-31.)

Taylor asked Dr. Ferguson whether she would receive a clinical absence for having to miss

the meeting.  (*Id.*)  Dr. Ferguson responded: "No, it will be okay as long as you complete

the assignment. . . . Hope all goes well at your appointment."  (*Id.*)

Also on April 5, 2021, Taylor emailed Dr. Nelson and informed her that she would

not be at the lecture that day as there was something wrong with her feeding tube or that

her stomach motility had worsened and that she was hoping to get the issue figured out

6

that week.  (ECF No. 39-4 at 34.)  Dr. Nelson responded: "Ok, thanks for letting me know. I hope you have it figured out and you're feeling better."  (*Id.*)

On April 7, 2021, Taylor emailed instructor Sarah Hathcock that she would not be present for a lecture on that day due to an appointment.  (ECF No. 39-4 at 35.)  Hathcock responded: "Thank you for letting me know, Jessica.  Please let me know if there are any questions."  (*Id.*)

In early June of 2021, Taylor met with Dr. Annie Watson, CSU's Executive Director of Student Success Center and Disability Services, to discuss her need for accommodations.  (ECF No. 44:24 at 61:4–62:18.).  On June 8, 2021, Taylor emailed Dr. Watson to formally request accommodations, and she provided documentation from her medical provider to support her request.  (ECF No. 44-18 at 73:3-19; ECF No. 39-3 at 39; ECF No. 39-11 at 13:19–14:23; 49:8-16.)[2]

Specifically, Taylor formally requested the following seven accommodations:

1.    I may be excused from class (up to 2 hours at the beginning or end of class) for scheduled infusion treatment.  This will not count as a lecture absence; however, I must provide documentation of infusion appointment and make up any missed assignments.

2.    Student may be excused from clinical (up to 2 hours at the beginning or end of clinical) for scheduled infusion treatment.  This will not count as a clinical absence; however, student must provide documentation of infusion appointment and make up missed time with an alternative assignment.

3.    I may be allowed to take exams outside of the scheduled time in case

---

[2] Taylor states in her email that she was not sure who to contact regarding accommodations and that she had "been told by [her] professors in the College of Nursing that disability services does not accommodate for medical diagnoses."  (ECF No. 39-3 at 39.)  The Court notes that Defendant disputes this because Taylor's assertion is at odds with Dr Meier's email to Taylor in January of 2021, which informed Taylor that "[a]ny accommodations would have to be requested through the Student Access Center with Dr. Annie Watson." (ECF No. 39-3 at 43-46.)

               of pre-scheduled clinic visit, procedure, infusion, ER visit, or hospital admission. The exam should be administered in the same format as other students' exams. Documentation of medical reason for absence will be provided by student.

4.      I may be allowed to leave the room at any time during lecture or an exam (without penalty) to take medication, use the restroom, or tend to feeding tube.

5.      I will have access to a chair at all times during lecture/clinical in case of symptoms caused by disease.

6.      I will not be assigned an infectious patient during clinical experience due to being immunosuppressed.

7.      I may be allowed extensions on assignments/more time to take exams when experiencing side effects of infusions/pre-meds for infusions. Medical documentation can be provided as proof of infusion.

(ECF No. 44-10 at 1.)

      Dr. Watson ultimately prepared an accommodation plan for Taylor, dated July 12, 2021, which provided Taylor with nearly all of her requested accommodations, including some additional accommodations that she did not request. (ECF No. 39:4 at 2-7.) Specifically, CSU granted Taylor the following accommodations: extended time on tests, quizzes, graded in-class assignments, and final exams, in a less distracting environment; permission to make up exams due to illness/hospitalization; consideration for making up work due to illness/hospitalization; permission to audio record class lectures; Notes/PowerPoint slides provided by professors; permission to be excused for a brief period during class meetings and testing, if needed; preferred classroom seating; access to a chair during lecture/clinical in case of symptoms caused by disease; not be assigned an infectious patient during clinical experience due to being immunosuppressed; and permission to be excused for a brief period during class meetings or testing, if needed.

(ECF No. 44-11 at 1-2.)

Regarding Taylor's request to arrive to clinicals or lectures up to two hours late and leave up to two hours early, Dr. Watson discussed this request with Dr. Meier, and they then met with Taylor to further discuss this request.  (ECF No. 44-14 at 38:16–39:7; ECF No. 44-24 at 14:17–15:22.)   During her deposition, Taylor agreed that there was no limitation to her requests to be excused from classes and clinicals for up to two hours at a time yet not receive absences for missing time during those classes and clinicals.  (ECF No. 44-18 at 97:8–98:5; ECF No. 44-24 at 18:12-23).  As an alternative to Taylor's request, CSU provided Taylor with the accommodation that it deemed reasonable, which was permission to be excused for a brief period during class meetings and testing, if needed.  (ECF No. 39-4 at 4.)  Regarding Taylor's request as it related to clinicals, Dr. Meier and Dr. Watson explained to Taylor that "clinical rotation hours and days are dictated by the hospital sites . . . [f]aculty members must be present for all student clinical rotations . . . and students must complete a specific number of clinical hours per course per semester in order to progress on to the next rotation." (*Id*. at 6-7.)  Dr. Watson and Dr. Meier provided Taylor with an alternative accommodation of allowing her to attend a morning clinical as opposed to an afternoon clinical to work around Taylor's infusion schedule.  (ECF No. 44-24 at 20:11–21:1; ECF No. 44-14 at 39:14–40:3.)

Following the meeting with Taylor, Dr. Watson provided Taylor with the accommodation plan dated July 12, 2021, as outlined above.  (ECF No. 39-4 at 4-5.)  Dr. Watson also sent Taylor correspondence explaining why the accommodation requests to miss up to two hours per class or clinical were not deemed reasonable by CSU.  (*Id*. at 6-7.)

Regarding Taylor's request to not be assigned an infectious patient during clinicals, Dr. Watson initially granted this request and stated: "While you do not have to divulge personal information about your disability, you should coordinate a protocol with your professors in advance of clinical rotations to identify whether or not a *known* risk is present." (*Id.* at 5 (emphasis in original).) On August 18, 2021, however, prior to the beginning of the fall 2021 semester, Taylor reached out to Dr. Meier regarding this accommodation. (ECF No. 39-4 at 8-9.) Dr. Meier then emailed Dr. Watson and explained that the "College of Nursing will not be able to accommodate the Accommodation Plan for Jessica Taylor where she was granted the accommodation not to be assigned to an infectious patient during clinical experiences." (ECF No. 44-13 at 1.) Dr. Meier further explained that this was not a reasonable accommodation because "all nursing students and health care professionals in a health care facility are always going to incur the risk of exposure to a variety of infectious diseases- it is the nature of the work that is done, and especially at a time like this when the risk of exposure to COVID in a clinical setting is prevalent. All hospitals are seeing a surge in COVID positive and COVID presumed patients."[3] (*Id.*)

Prior to the beginning of fall 2021 semester classes, Taylor met with Dr. Watson and Dr. Meier to further discuss this requested accommodation. (ECF No. 44-18 at

---

[3] In the same email, Dr. Meier stated:

In the future, please discuss such accommodations with me in advance of granting them to a student to ensure that these are things we could reasonably grant a student. I can assure you that in no circumstance would we ever agree to tailor a student's preference of patient assignment based on their own limitations. This only opens us up to a variety of liabilities, not limited to a lawsuit. I should add that this is the same student who filed a class action lawsuit against us last May because we were forced to move classes online.

(ECF No. 44-13 at 1.)

207:14–208:18.)  Dr. Meier informed Taylor that CSU could not reasonably accommodate a request to never assign a nursing student to an infectious patient during clinicals due to the broad nature of what constitutes an "infectious" patient and due to the increase in COVID-positive and COVID-presumed positive patients at the clinical sites, and Taylor admitted during her deposition that she was a participant in this conversation.  (ECF No. 44-18 at 208:6-18; ECF No. 44-14 at 121:21–122:7; 122:13-20; 123:11-14.)

In relation to this accommodation request, in April 2022, Taylor asked her neurologist, Dr. Katherine Ruzhansky, if she was concerned enough about the risks associated with Taylor taking care of infectious patients in the nursing program that Taylor should consider moving on from nursing and healthcare in general.  (ECF No. 44-18 at 216:21–217:17.)  Dr. Ruzhansky responded: "I cannot really answer the question, because infectious patients is a very broad category, and there are patients who are chronically infected, such as with HIV disease, who cannot spread it to others easily.  There are also those with communicable diseases[.]"  (*Id.*)

Following this discussion with Taylor, CSU amended Taylor's accommodation plan prior to the start of clinicals in the fall 2021 semester and removed the accommodation related to not being assigned an infectious patient.  (ECF No. 39-4 at 10-11; ECF No. 39-13; ECF No. 44-14 at 120:14–121:14.)  Taylor continued in the nursing program without this accommodation.

In August 2021, following Taylor's initial request for accommodations to ODS, she contacted Dr. Watson about the option to complete all her courses virtually, except for her clinicals. (ECF No. 44-18 at 116:10-18.)  Plaintiff testified that she received information that CSU was offering non-clinical and non-lab students the option to take all courses virtually

during the fall 2021 semester.  (ECF No. 39-4 at 20.)  CSU asserts that it denied this request because Taylor was willing to attend the clinical portion of her classes in person. (ECF No. 44-24 at 15:24 - 16:21; 22:7-11.)  Taylor continued in the nursing program.  (ECF No. 44-14 at 198:1-21.)

Taylor emailed instructor Lynne Mann on August 27, 2021, regarding her accommodation paperwork and to ask if she could bring a bag containing her medication, cell phone, water, and snack to the psychiatric clinical site.  (ECF No. 39-4 at 12-16.)  Mann forwarded Taylor's email to Dr. Meier, and Dr. Meier spoke with the Chief Nursing Officer at the clinical site.  (*Id.*)  Dr. Meier then told Taylor that she could wear her Apple watch while on the unit, bring other items in a bag to keep in the break room on the unit, and go to her car when she needed water or nutrition.  (*Id.*)  Taylor agreed that was reasonable and thanked Dr. Meier for reaching out to the clinical site.  (*Id.*)

During the fall of 2021, Taylor withdrew from the nursing program after she fell down stairs in September 2021 and injured her back.  She testified that her withdrawal from her courses was voluntary.  (ECF No. 44-18 at 55:9-14).  CSU permitted Taylor to complete the one non-clinical course that she was enrolled in that semester virtually.  (ECF No. 39-4 at 17-20.)  CSU refunded Taylor's tuition for the partially completed nursing courses, and CSU asserts that it told her she could return the next semester without penalty, which she did.  (ECF No. 44-18 at 255:14–256:10, 265:16-22.)

It appears that Taylor returned to the nursing program in the spring of 2022 and completed that semester without any significant issues.  (ECF No. 44-18 at 265:16-22.) At the end of the spring 2022 semester, on April 19, 2022, Dr. Ball, the new Dean of the College of Nursing, and Hathcock met with Taylor after Taylor informed two of her

12

instructors that she had concerns for her own health and safety and was scared that she was going to pass out while at clinicals. (ECF Nos. 39-16, 39-18).  Dr. Ball and Taylor discussed Taylor's medical conditions and her concerns about continuing in CSU's nursing program.  (*Id.*)  Dr. Ball told Taylor: "We would love for you to stay in nursing.  You've already invested a lot. [] The only reason for this conversation is that we want to make sure you're set going into the fall and spring."  (*Id.*)  Taylor was informed that in the fifth semester of the nursing program, a clinical care clinical would risk of exposure to infectious patients.  (*Id.*)  Dr. Ball encouraged Taylor to discuss the program requirements with her medical provider, and Dr. Ball informed Taylor that the decision whether to continue in the program was Taylor's based on consultation with her medical provider.  (*Id.*)

Following the meeting with Dr. Ball, Taylor informed her advisor, Dr. Sherry Dial, that she was considering pursuing the cybersecurity major at CSU. (ECF No. 39-4 at 38-39.) Taylor specifically told Dr. Dial: "I do not think I am going to be able to continue in the nursing program due to medical reasons.  I have spent a lot of time thinking about this and strongly believe that I am making the best decision to move on with a different career." (*Id.*)

Taylor testified that she voluntarily withdrew from CSU's nursing program at the end of the spring 2022 semester to pursue the cybersecurity major at CSU.  (ECF No. 44-18 at 55:3-8.)  Taylor was told she could take off a semester and later return without any penalty, as she had done earlier in her academic career.  (ECF No. 44-14 at 235:3-8). Taylor received a new accommodation plan tailored to her major of cybersecurity dated August 15, 2022.  (ECF No. 44-18 at 135:17 - 136:1; ECF No. 39-4 at 21-23.)  The new accommodation plan included her pre-existing accommodations applicable to the cybersecurity major with the additional accommodation of having a computer in class for

note taking.  (*Id.*)

## STANDARD OF REVIEW

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party."  *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996).

The party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings.  *Id.* at 324.  Rather, the non-moving party must demonstrate that specific, material facts exist that give rise to a genuine issue.  *Id.*  Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence' " in support of the non-moving party's case.  *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645,

14

649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)); *see also Anderson*, 477 U.S. at 252.

## DISCUSSION

Taylor asserts that CSU discriminated against her in violation of the ADA and the Rehabilitation Act by not providing her with the reasonable accommodations she requested, which, in turn, left her no choice but to withdraw from CSU's nursing program. Specifically, Taylor maintains that CSU should have assisted her in crafting accommodations to miss classes and clinicals for her infusion treatments and provide make up work via available virtual alternatives. She also asserts that CSU should have accommodated her request not to be assigned to any infectious patient during clinicals. According to Taylor, she was subject to harassment based on her disability. Taylor further alleges that she was retaliated against by CSU after she requested accommodations. Finally, Taylor argues that CSU's treatment of her amounted to intentional infliction of emotional distress under South Carolina law.

On the other hand, CSU denies violating the ADA or the Rehabilitation Act. It points out that Taylor voluntarily withdrew from the nursing program to pursue a major at CSU in another field. It maintains that it engaged in the interactive process with Taylor and provided her with almost every accommodation that she requested and some that she did not request. According to CSU, the accommodations that it did not provide were unreasonable and would fundamentally alter the nature of the nursing program. Specifically, as to her request that she be allowed to miss class for up to two hours at the beginning and end of class, CSU asserts that it provided multiple alternative accommodations, including the option to take short breaks from classes or clinicals and the

option to have either a morning or an afternoon clinical to work around her appointments. CSU contends that it was unable to accommodate Taylor's request not to be assigned to an infectious patient because it was impossible to know who was infectious in a clinical setting, particularly when many patients had COVID and were not exhibiting any symptoms. CSU denies retaliating against Taylor in any way and maintains that Taylor has failed to present evidence sufficient to survive summary judgment on her claim of intentional infliction of emotional distress.

**Applicable Law under the ADA and Section 504 of the Rehabilitation Act**

Title III of the ADA provides, in relevant part, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). That section of the ADA defines "discrimination" as including "a failure to make reasonable modifications" that are "necessary" to provide a disabled individual with such full and equal enjoyment, "unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." *Id.* at § 12182(b)(2)(A)(ii). Section 504 of the Rehabilitation Act of 1973 precludes federal grantees from excluding, denying benefits to, or discriminating against any "otherwise qualified individual . . . solely by reason of her or his disability." 29 U.S.C. § 794(a).

To establish a claim for disability discrimination under the ADA in the academic programming context, a plaintiff must show that (1) she has a disability, (2) she is otherwise qualified to participate in the defendant's program, and (3) she was excluded from the program on the basis of her disability. *See Halpern v. Wake Forest Univ. Health Scis.*, 669

F.3d 454, 461 (4th Cir. 2012).  In the Fourth Circuit, courts analyze ADA and Section 504 disability discrimination claims under similar legal frameworks.  *Halpern*, 669 F.3d at 461 ("To the extent possible, we construe the ADA and Rehabilitation Act to impose similar requirements. . . . Thus, despite the different language these statutes employ, they require a plaintiff to demonstrate the same elements to establish liability.").  However, Section 504 has a heightened causation requirement, which requires a plaintiff to establish that she was excluded "solely by reason of" her disability.  *Id.* at 461-62.  Under the ADA, a plaintiff must establish that her disability was a "motivating cause" for exclusion.  *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468-69 (4th Cir. 1999).

Under the ADA and Section 504, an educational institution is not required to make fundamental or substantial modifications to its program or standards; it need only make reasonable ones.  *See Alexander v. Choate*, 469 U.S. 287, 300 (1985).  A modification is not reasonable if it either imposes undue financial and administrative burdens or requires a fundamental alteration in the nature of the program.  *Halpern*, 669 F.3d at 464.  A court may grant summary judgment in favor of a defendant "if the plaintiff fails to present evidence from which a jury may infer that the accommodation is 'reasonable on its face, i.e., ordinarily or in the run of cases,' or if the defendant establishes as a matter of law that the proposed modification will cause 'undue hardship in the particular circumstances.'" *Id.* at 464 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (2002)).

CSU, as a "program . . . receiving Federal financial assistance," is subject to the Rehabilitation Act of 1973, including Section 504 of that Act.  29 U.S.C. § 794(a).  In addition, because it is an "undergraduate, or postgraduate private school, or other place of education," CSU qualifies as a "public accommodation" subject to Title III of the ADA.

42 U.S.C. § 12182(a).

In assessing student disability claims, courts are "required to accord deference to 'an educational institution's academic decisions' as well as its 'determination that a reasonable accommodation is not available.'" *Beemer*, 2017 U.S. Dist. LEXIS 116356 (C.D. Cal. July 24, 2017) (quoting *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1047 (9th Cir. 1999)). The "federal judiciary is ill equipped to evaluate the proper emphasis and content of a school's curriculum and should afford a university's judgment and discretion great respect. . . . In assessing the importance of academic requirements in health care programs especially, where the 'conferral of a degree places the school's imprimatur upon the student as qualified to' practice, the judiciary ought only to reluctantly intervene." *Gati v. W. Ky. Univ.*, 762 F. Appx. 246, 251 (6th Cir. 2019). This is especially true in the "clinical setting because evaluation in a clinical course 'is no less an academic judgment because it involves observations of . . . skills and techniques in actual conditions of practice, rather than assigning a grade to . . . written answers on an essay question.'" *Mootoor v. E. Ky. Univ.*, 2020 U.S. Dist. LEXIS 171874, at *24-25 (E.D. Ky. Sept. 20, 2020), aff'd 2022 U.S. Dist. LEXIS 687, (6th Cir. Mar. 15, 2022) (citations omitted).

**Taylor's Claims of Discrimination Pursuant to the ADA and the Rehabilitation Act**

Taylor alleges two different theories of discrimination under the ADA and the Rehabilitation Act. First, Taylor asserts that CSU failed to accommodate her disability, which forced her to leave the nursing program. Second, Taylor asserts that CSU harassed her based on her disability.

After review, the Court finds that Taylor has failed to establish a *prima facie* case of

disability discrimination under the ADA or the Rehabilitation Act because it is undisputed that she voluntarily withdrew from the nursing program.  Indeed, Taylor testified that she voluntarily withdrew from CSU's nursing program during the fall 2021 semester and again at the end of the spring 2022 semester.  (ECF No. 44-18 at 55:3-23.)  Furthermore, the undisputed evidence demonstrates that Taylor completed every semester that she started in the nursing program, with the exception of the two semesters where she admits that she voluntarily withdrew.  (*Id*. at 55:3-8; 159:23–160:6; 265:20-22.)  Additionally, it appears that Taylor remains a student at CSU and could re-enroll in the nursing program if she chose to do so.  (*See* ECF No. 44-14 at 235:3-8.)  As such, the Court finds that Taylor has failed to establish an essential element of a *prima facie* case, namely, that she was excluded from the program on the basis of a disability.  *See, e.g., Infante-Levy v. Hawaii*, 2019 U.S. Dist. LEXIS 189385, at *2 (D. Haw. Oct. 31, 2019); *Beemer v. Univ. of S. Cal.*, 2017 U.S. Dist. LEXIS 116356, at *26 (C.D. Cal. July 24, 2017).

Next, with respect to Taylor's assertion that she was constructively discharged from the nursing program, the Court notes that Taylor has not identified any case recognizing a constructive discharge theory in the education context, and at least one court has plainly rejected such a theory.  *See, e.g., Buescher v. Baldwin Wallace Univ.*, 86 F. Supp. 3d 789, 807 (N.D. Ohio 2015) (granting summary judgment on constructive dismissal from nursing program claim and finding that "Plaintiffs argue at length that [they] were actually forced to withdraw and were treated disparately from the other students.  But plaintiffs do not demonstrate that a cause of action for constructive dismissal exists outside the employment context.") (citations omitted).  This Court declines to recognize a constructive discharge theory outside of the employment context under the circumstances of this case.

19

Here, Plaintiff testified that she voluntarily withdrew from the nursing program to pursue a degree in cybersecurity, and the Court finds that Plaintiff cannot establish that she was excluded from the program "solely by reason of" her disability as required under Section 504.  Nor can Plaintiff establish that her disability was a "motivating cause" for her exclusion from the program under the ADA because there is no genuine dispute of material fact that she voluntarily withdrew from the nursing program.  Indeed, Taylor admits that CSU did not remove her from the program.  As such, the Court finds that Taylor has failed to carry her burden and establish a *prima facie* case of disability discrimination under either the ADA or Section 504 of the Rehabilitation Act.  Accordingly, CSU is entitled to summary judgment on these claims.

In addition, to the extent Plaintiff argues that she was excluded from the nursing program based on CSU's failure to reasonably accommodate her disability, the Court finds no genuine dispute of material fact that Taylor was provided nearly every accommodation that she requested, and furthermore, that the denied accommodations were unreasonable and/or would result in a fundamental or substantial modification to CSU's nursing program. In other words, the Court finds that Taylor has failed to carry her burden of establishing that the accommodations that she sought but did not receive were facially reasonable.

To be clear, the following three denied accommodations appear to be at issue in this case: (1) Taylor's request to be excused from class or clinicals up to two hours at the beginning or two hours at the end for scheduled infusion treatment; (2) Taylor's request to not be assigned to an infectious patient during clinicals due to being immunocompromised; and (3) Taylor's request to complete all lecture classes virtually during the fall 2021 semester.  With regard to the first denied accommodation, the Court finds it wholly

20

appropriate to give deference to CSU's determination that this is an unreasonable request that would fundamentally alter the nature of the nursing program. Stated plainly, the Court agrees with CSU that to allow Taylor to leave class or clinicals for up to two hours at the beginning or end *without any limitations* would diminish the academic integrity of the program and could result in Taylor receiving less instruction and fewer clinical hours than is required to graduate. Courts have recognized that lowering standards, including clinical hours and classroom hours, is not a reasonable accommodation under the ADA or the Rehabilitation Act. *See, e.g., Darian v. Univ. of Mass.*, 980 F. Supp. 77, 89-91 (D. Mass. Sept. 16, 1997) (granting summary judgment for defendant on plaintiff's disability discrimination claims under the ADA and the Rehabilitation Act and finding that defendant met its obligation to reasonably accommodate plaintiff because defendant "had no obligation to permit [plaintiff] to forego providing patient care, forego half of the required clinical assignments, and still receive credit for the course" . . . and further that "[a] waiver by the University not only of its attendance requirement but also patient care would have been a substantial–indeed extreme–accommodation."); *Gati*, 762 F. App'x 246, 251 (granting summary judgment for defendant on plaintiff's disability discrimination claims under the ADA and the Rehabilitation Act upon finding that plaintiff failed to demonstrate that the requested accommodation to participate in classes remotely or other alternative delivery methods was not reasonable as the academic integrity of the program would be jeopardized through such alternative methods); *Shaikh v. Lincoln Mem'l Univ.*, 608 F. App'x 349, 355 (6th Cir. Apr. 27, 2015) (granting summary judgment for defendant on plaintiff's disability discrimination claims under the ADA and the Rehabilitation Act and finding that plaintiff's proposed accommodation of a decelerated curriculum was "a significant departure

21

from the only accredited program at LMU- [and] alone supports the proposition that [plaintiff]'s proposed accommodation was not reasonable."). Furthermore, the record reflects that CSU provided Taylor with alternative accommodations, such as permission to be excused for brief periods during class meetings or testing, and the option to attend an earlier clinical as opposed to an afternoon clinical to work around Taylor's infusion schedule. (ECF No. 44-24 at 20:11 - 21:1; ECF No. 44-14 at 39:14 - 40:3; 70:9-25; ECF No. 39-4 at 4.) And Dr. Meier provided Taylor with the clinical schedules for the remaining two semesters of the nursing program so Taylor could schedule infusion appointments in advance and avoid conflicts. (ECF No. 39-4 at 6-7.) Taylor chose to continue in the nursing program with these alternative accommodations in place, and the Court finds that Defendant met its obligations to reasonably accommodate Taylor in this regard.

As for Taylor's second denied accommodation, namely, her request to not be assigned to an infectious patient during clinicals, the Court again finds it entirely appropriate to give deference to CSU's determination that this is not a reasonable accommodation for a nursing student, particularly during an ongoing pandemic.[4] The record reflects that Dr. Meier informed Taylor that CSU could not reasonably accommodate this request due to the broad nature of what constitutes an "infectious" patient and due to the increase in COVID-positive and COVID-presumed positive patients at clinical sites. (ECF No. 44-18 at 208:6-18; ECF No. 44-14 at 119:6–121:8; 121:21–122:20; 123:11-14; 124:8–125:5). CSU also determined it could not provide this accommodation and meet its obligations to

---

[4] The Court notes that Taylor's requested accommodation was not limited to a request not to be assigned to patients who had COVID or who potentially had COVID; rather, her request was not to be assigned to an infectious patient during clinicals. As Taylor's neurologist stated: ". . . infectious patients is a very broad category . . . :" (ECF No. 44-18 at 216:21–217:17.)

Taylor as a student and its obligations to the State Board of Nursing because any patient could be potentially infectious, and Taylor could not receive the required clinical experiences without treating patients.[5]

Ultimately, the Court agrees with CSU that Taylor's requested accommodation was unreasonable in the context of a clinical nursing education, as CSU could not insulate Taylor from all infectious patients without fundamentally altering the nature of the program.[6] In any event, it is clear that CSU's denial of this request did not result in Taylor's exclusion from the nursing program, as Plaintiff discussed the matter with her doctor and decided to

---

[5] As Dr. Watson explained to Plaintiff:

> . . . the nature of the academic programming for nursing is that you – that students – students be available, specifically in a clinical setting, to be able to deal with any kind of patient, because that is the nature of what they do. They don't pick and choose patients. And in the career of nursing, you don't get to do that, either. And hence, that is a part of your clinical program, not to allow students to be able to choose patients or – or stray – or shy away from patients for any particular reason.

(ECF No. 43-10 at 8.) And as Dr. Meier further explained:

> I think it's understood in a healthcare discipline, when you're in a healthcare facility, that you always incur the risk of exposure. You don't necessarily incur exposure, but you incur a risk of exposure, no matter what patients you're working.
>
> You have MRSA, which is invisible. Staph-resistant infections, things like that, those can run across all patients, if not – probably all staff at this point have picked up some sort of infectious disease just by caring for these patients.
>
> And so to – to – to blanket, you know, an infectious patient, "I can't work with an infectious patient," well, that's a very broad and general, you know, unreasonable and unrealistic, you know, measure or standard for us to be able to work with.

(*Id.* at 8-9.)

[6] The Court finds a recent case from the U.S. District Court for the Western District of North Carolina instructive. *See Mary A. Kumagah v. Alderstate United Methodist Retirement Community, Inc.*, No. 3:22-cv-00041-FDW-DCK, 2022 U.S. Dist. LEXIS 231560, at *16-17 (W.D.N.C. Dec. 27, 2022). In *Kumagah*, the court found that a Licensed Practitioner's request that she not work with COVID patients was unreasonable because such patients could be asymptomatic and unknowable. The court stated that "such a request is unreasonable on its face because it is seemingly impossible for Defendant to have complied with, and further, doing so would have imposed an undue administrative burden by requiring Defendant to transfer Plaintiff off any COVID-positive patient's case[.]" *Id.*

23

continue in the nursing program through the spring 2022 semester.  (ECF No. 39-4 at 11.)

Next, with respect to the third denied accommodation, namely, Taylor's request in August of 2021 to complete her lecture courses virtually, Taylor does not appear to have tied her request for virtual learning to her disability.  Nor does she contend that this request was required for her to participate in the nursing program.  (ECF No. 44-18 at 116:10–18.) Furthermore, Taylor was willing to complete clinicals in-person, but she asked to complete nursing program lectures virtually, as she had heard this was an option for students in other programs.  (*Id*. at 117:2–119:7; 118:13-20).

Ultimately, the Court finds that Taylor has not demonstrated how this requested accommodation was reasonable, particularly in light of the fact that Plaintiff was willing to attend her clinical courses in person.  Additionally, even if CSU had the capability to provide this option to Taylor, as she contends, the Court is extremely mindful of the guidance provided by other courts in this context and notes that it would be entirely inappropriate for this Court to substitute its judgment for that of CSU, especially when it comes to the most effective methods for clinical instruction and the most appropriate academic requirements in healthcare programs.[7]  *See, e.g., Gati v. W. Ky. Univ.*, 762 F. App'x. 246, 251 (6th Cir.

---

[7] The Court also notes that to the extent Taylor asserts that CSU should have made greater virtual options available to her as it did with nursing students during the spring 2020 semester due to the COVID pandemic, the Court is not persuaded.  As courts have explained, at least in the employment context, the COVID lockdown period was unique and unprecedented, and simply because virtual options were available to employees during that period does not mean that employers (or universities, in this instance) were required to continue all virtual options for employees (or students, in this instance) once it was feasible to return to in-person options. *See, e.g.*, *Jordan v. Sch. Bd.*, 2023 U.S. Dist. LEXIS LEXIS 159057, at *33-34 (E.D. Va. Sep. 7, 2023) ("The court is also not persuaded by [plaintiff's] argument that since she performed remotely during the COVID-19 pandemic, she can work remotely again and accomplish all essential functions of her position . . . . . However, these temporary pandemic-related modifications [do] not [] mean that the essential functions have somehow changed.") (citations omitted); *Maffett v. City of Columbia*, Case No. 3:19-832-MGL-KDW, 2021 U.S. Dist. LEXIS 178622 (D.S.C. Apr. 19, 2021) (recommending that employer's motion for summary judgment be granted on failure to accommodate claim and rejecting the plaintiff's argument that because remote work was offered during the pandemic that employer had an obligation to continue remote work after

2019) ("[The] federal judiciary is ill equipped to evaluate the proper emphasis and content of a school's curriculum and should afford a university's judgment and discretion great respect. . . .  In assessing the importance of academic requirements in health care programs especially, where the 'conferral of a degree places the school's imprimatur upon the student as qualified to' practice, the judiciary ought only to reluctantly intervene."); *Beemer*, 2017 U.S. Dist. LEXIS 116356 (C.D. Cal. July 24, 2017) (quoting *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1047 (9th Cir. 1999)) (Courts are "required to accord deference to 'an educational institution's academic decisions' as well as its 'determination that a reasonable accommodation is not available.'"); *Mootoor*, 2020 U.S. Dist. LEXIS 171874, at *24-25; aff'd 2022 U.S. Dist. LEXIS 687 (6th Cir. Mar. 15, 2022) (granting summary judgment for defendant on plaintiff's disability discrimination claims under the ADA and the Rehabilitation Act and finding, "[t]he judicial deference to educators in their curriculum decisions is no less applicable in a clinical setting because evaluation in a clinical course 'is no less an academic judgment because it involves observations of . . . skills and techniques in actual conditions of practice, rather than assigning a grade to . . . written answers on an essay question.'"  (citations omitted).

Based on the foregoing, the Court finds that CSU is entitled to summary judgment on Taylor's ADA and Section 504 failure-to-accommodate claims.

**Taylor's Claims of Disability Harassment**

In addition to her primary argument that CSU failed to accommodate her disability, Plaintiff also alleges that CSU harassed her based on her disability.  (ECF No. 1-1 at 72.)

_____

the pandemic).

After review, however, the Court agrees with CSU that Plaintiff's own deposition testimony defeats this claim. Specifically, Taylor testified that no one at CSU made any derogatory comments about her medical condition and that faculty and staff at CSU worked with her to accommodate her schedule and medical conditions. (ECF No. 44-18 at 61:6-11; 139:18 - 141:11; 142:19–144:22; 145:1–147:4; 258:22–259:6; ECF Nos. 39-3 at 43-46, 39-4 at 2-7, 10-11, 30-35.) Taylor further testified that no one at CSU treated her differently based on her disability or said anything demonstrating discriminatory or retaliatory animus. (ECF No. 44-18 at 258:17–259:7; 279:5-10.) Taylor also testified that during her time as a nursing student, she never informed anyone in leadership at CSU, including instructors, that she felt she was mistreated based on her disability or that non-disabled students were being treated better than her. (ECF No. 44-18 at 258:17–259:7; 279:5-10.). Thus, the Court finds that Plaintiff has failed to demonstrate that she experienced harassment based on her disability.

In addition to asserting that CSU harassed her, Taylor also argues that she "was not provided the same opportunities with regard to attendance, technology, simulation and remote access as were non-disabled students." (ECF No. 44 at 25). However, the Court finds that Taylor has not pointed to any evidence to create a genuine dispute of fact as to this argument. In other words, the Court finds no indication in the record that Taylor was discriminated against by CSU because of her autoimmune conditions or because of any other health concerns. Accordingly, the Court finds that CSU is entitled to summary judgment on Taylor's ADA and Section 504 discrimination claims.

### Taylor's ADA and Section 504 Retaliation Claims

To state a cause of action for retaliation under the ADA or Section 504, a plaintiff

must show that (1) she engaged in protected activity, (2) an adverse action was taken against her, and (3) a causal connection exists between the protected activity and the adverse action. *See A Soc'y Without a Name, for People without a Home, Millennium Future-Present v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011); *Staley v. Gruenberg*, 575 F. App'x. 153, 156 (4th Cir. 2014). A retaliation claim requires but-for causation, such that Taylor must show that "but for" the protected activity she engaged in, the adverse action would not have occurred. (*Id.*; *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013)).

It is undisputed that Taylor engaged in protected activity when she requested accommodations for her disability. As evidence that she experienced retaliation, Taylor claims that her:

> experience with the Nursing program began to erode from the time she first put a professor on notice that she had a medical condition and might need accommodation. From that day forward she had a target on her back. Although it was clear she could perform the work and get good grades in class, clinical and labs, CSU was not going to help her in any way to succeed.

(ECF No. 44 at 34). Importantly, Taylor does not identify the professor she refers to or the date when she put the unidentified professor on notice, and the Court finds no other evidence to support her statement. To the contrary, Taylor's own deposition testimony and the other record evidence shows that CSU took numerous efforts to support Taylor as a student while she was enrolled in CSU's nursing program. (ECF No. 39-11 at 49:8-16; ECF No. 39-3 at 43-46; ECF No. 39-4 at 12-16, 24-35). For example: in January 2021, Taylor emailed Dr. Meier regarding appropriate footwear for clinicals, and Dr. Meier let her know that should she need accommodations, she could reach out to Dr. Watson; in March of

2021, Dr. Nelson worked with Taylor and allowed her to bring requested items to Cath Lab on-site at a hospital facility; on April 5, 2021, Dr. Ferguson confirmed that Taylor would not receive a clinical absence as long as she completed a makeup assignment; on April 5, 2021, Dr. Nelson responded supportively when Taylor told her she would have to miss a lecture due to an issue with her feeding tube; on April 7, 2021, Hathcock responded supportively when Taylor told her she would have to miss a lecture due to an appointment; on August 27, 2021, Dr. Meier and Mann worked to accommodate Taylor by allowing her to bring items on-site to a clinical facility; on April 11, 2022, Taylor informed Heaton that she would not be in class or clinical that week due to medical appointments, and Heaton offered to arrange an alternate live clinical experience for Taylor, to which Taylor responded and noted her own health and safety concerns; and on April 19, 2022, Dr. Ball and Hathcock met with Taylor to address Taylor's health and safety concerns as they related to her continuing in CSU's nursing program (ECF No. 39-16). (*See* ECF No. 39-3 at 43-46; ECF No. 39-4 at 12-16, 30-35; ECF No. 39;16; ECF No. 39-18.)

Taylor also argues that CSU retaliated against her "by telling her she was not good enough to be a nurse and that she would eventually be expelled." (ECF No. 44 at 34.) However, Taylor does not identify who said these things to Taylor and when they were said, or even whether such individual(s) was affiliated in any way with CSU.[8] Taylor also claims that "CSU disciplined [her] for allegedly violating clinical policies when she was granted

---

[8] To the extent Plaintiff relies on the conversations (which were recorded and transcribed) with Drs. Meier and Watson to support her assertion that she was told she would not succeed as a nurse or would be expelled from school if she continued, the Court is not persuaded by Plaintiff's interpretation of these conversations. (*See* ECF No. 43-10.) Rather, the Court finds that the transcripts speak for themselves and in no way create a dispute of fact as to Plaintiff's claims. Furthermore, the Court notes that when asked at her deposition whether someone told her specifically that she should drop out of the nursing program, she responded that she "can't recall specific names." (ECF No. 44-18 at 272:6.)

permission to bring in necessary medical items," but the Court finds no evidence to support the assertion that she was disciplined as a nursing student. (*Id.*)  Furthermore, the Court finds that Taylor's claim that she was told she needed to withdraw from the program is completely belied by her testimony that she voluntarily withdrew from CSU's nursing program.  (ECF No. 44-18 at 55:3-23; 158:6-10.)

After a thorough review of the record, the Court finds no evidence to create a genuine dispute of fact as to whether Taylor was threatened with expulsion from the nursing program or was otherwise asked to leave, pressured to withdraw, or forced out of the program.  Stated differently, the Court finds that Taylor has failed to establish that she experienced any adverse action or that such action was caused by a disability. Accordingly, CSU is entitled to summary judgment on Taylor's ADA and Section 504 retaliation claims.

### Taylor's Claim for Intentional Infliction of Emotional Distress

Under South Carolina law, to recover for outrage (otherwise known as intentional infliction of emotional distress), a plaintiff must show:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain, or substantially certain, that such distress would result from his conduct;

> (2) the conduct was so "extreme and outrageous" so as to exceed "all possible bounds of decency" and must be regarded as "atrocious, and utterly intolerable in a civilized community;"

> (3) the actions of the defendant caused plaintiff's emotional distress; and

> (4) the emotional distress suffered by the plaintiff was "severe" such that "no reasonable man could be expected to endure it."

*Bass v. S.C. Dep't of Soc. Servs.*, 414 S.C. 558, 780 S.E.2d 252, 260-61 (S.C. 2015)

(quoting *Argoe v. Three Rivers Behavioral Health, L.L.C.*, 392 S.C. 462, 710 S.E.2d 67, 74 (S.C. 2011)).  When addressing whether the plaintiff has stated a *prima facie* claim of outrage on summary judgment, the South Carolina Supreme Court has stated:

> Under the heightened standard of proof for emotional distress claims emphasized in [*Ford v. Hutson*, 276 S.C. 157, 276 S.E.2d 776 (S.C. 1981)], a party cannot establish a prima facie claim for damages resulting from a defendant's tortious conduct with mere bald assertions.  To permit a plaintiff to legitimately state a cause of action by simply alleging, "I suffered emotional distress" would be irreconcilable with this Court's development of the law in this area.  In the words of Justice Littlejohn, the court must look for something "more"-in the form of third party witness testimony and other corroborating evidence-in order to make a prima facie showing of "severe" emotional distress.

*Hansson v. Scalise Builders of S.C.*, 374 S.C. 352, 650 S.E.2d 68, 72 n.3 (S.C. 2007).

Here, the Court finds that Taylor has failed to demonstrate something "more" (in the words of Justice Littlejohn)–other than her own assertion that she suffered emotional distress.  While Taylor asserts that CSU "continually threatened to terminate her from the nursing school," the Court finds no evidence to support this assertion.  (ECF No. 44 at 36.) In fact, in both recorded conversations relied on by Taylor to support her claims, both Drs. Meier and Ball expressly tell Taylor that they would love for her to stay in the nursing program.  (ECF No. 44-7 at 36:17-20 and 75:22-23.)  Furthermore, Taylor testified that no one at CSU made any derogatory comments about her medical condition and that faculty and staff at CSU worked with her to accommodate her schedule and medical conditions. (ECF No. 44-18 at 61:6-11; 139:18 - 141:11; 142:19 - 144:22; 145:1 - 147:4; 258:22 - 259:6; ECF Nos. 39-3 at 43-46, 39-4 at 2-7, 10-11, 30-35.)  Taylor also testified that no one in the nursing program told her she needed to leave the nursing program, and that she voluntarily withdrew from the program.  (*Id.* at 158:6-10; 55:3-14.)

Ultimately, the Court finds that Taylor has failed to point to any evidence that meets the threshold necessary to demonstrate that CSU intentionally or recklessly inflicted severe emotional distress upon her or that any conduct was so extreme and outrageous as to exceed all possible bounds of decency.  Accordingly, CSU is entitled to summary judgment on Taylor's claim for intentional infliction of emotional distress under South Carolina law.

## **CONCLUSION**

For the foregoing reasons, the Court grants in full Defendant's motion for summary judgment.  (ECF No. 39.)

**IT IS SO ORDERED.**

/s/Bruce H. Hendricks
United States District Judge

September 26, 2024
Charleston, South Carolina

31